## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

NICOLE BISSONETTE, as Personal )
Representative of the Estate of James Mannion, )
                                                )
          Plaintiff, )
                                                 )        Case No. 2:24-cv-00251-JCN
     v. )
                                                 )      **JURY TRIAL DEMANDED**
CUMBERLAND COUNTY SHERIFF KEVIN )
JOYCE, ARMOR CORRECTIONAL HEALTH )
CARE SERVICES, INC., ARMOR HEALTH )
OF CUMBERLAND COUNTY, EDIE )
WOODWARD, JASON SIMPSON, and )
MATTHEW GLAZER, )
                                                )
         Defendants. )

## FIRST AMENDED COMPLAINT[1]

     Plaintiff, Estate of James Mannion, by and through its Personal Representative, Nicole Bissonette, and its attorneys, Kaplan & Grady LLC and Garmey Law, complains of Defendants Cumberland County Sheriff Kevin Joyce, Armor Correctional Health Care Services, Inc., Armor Health of Cumberland County, Edie Woodward, Jason Simpson, and Matthew Glazer, and states as follows:

## INTRODUCTION

     1.     On August 14, 2022, James Mannion died following months of unsuccessful pleas for opioid use disorder medication while under the custody and care of Cumberland County Jail and Armor Correctional Health Care Services, Inc and/or Armor Health of Cumberland County.

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(1), Plaintiff is filing this Amended Complaint as a matter of course because it has been less than 21 days since the first Defendant was served, and additionally, it has been less than 21 days since the first Answer was filed. Fed. R. Civ. P. 15(a)(1)(A)-(B).

2.      James was just thirty years old when he overdosed from fentanyl and died without receiving adequate medical care.

3.      James was born in York and raised in Wells, Maine, where he played high school football. He left behind two young daughters: O.M., who is nine years old, and A.M., who is six. James loved to take his daughters biking and fishing, and he loved his work as a barber.

4.      Defendants were aware (and noted in his medical records) that when James entered Cumberland County Jail ("CCJ") on December 3, 2021, he was using heroin daily, "starting to withdraw," and was or had recently been enrolled in a medication for opioid use disorder ("MOUD") program, where he was taking Suboxone, a version of MOUD. The medication Suboxone is proven to reduce opioid cravings, withdrawal symptoms, and overdose deaths.

5.      Opioid use disorder ("OUD") is a chronic brain disease. It negatively impacts the brain's dopamine system, which is crucial for cognitive functions necessary for survival. Symptoms of this brain disease include uncontrollable cravings for and compulsive use of opioids despite their negative consequences, decreased sensitivity to opioids, and often excruciating withdrawal pain and suffering.

6.      The science is clear: the only effective medication for this brain disorder, which often results in death, is MOUD. The American Medical Association ("AMA"), for example, has recognized that MOUD is appropriate and necessary for patients in jail and prison settings and is "essential for providing evidence-based care for [] patients with substance use disorder."[2]

---

[2] *AMA Calls for Access to Substance Use Disorder Treatment in Prisons, Jails* (2021), https://www.ama-assn.org/press-center/press-releases/ama-calls-access-substance-use-disorder-treatment-prisons-jails (last visited July 11, 2024).

7.      Defendants had a constitutional obligation to provide James with adequate health care while at Cumberland County Jail. Nevertheless, during the nine months James was detained there, the Defendants did nothing to medically address his chronic brain disease.

8.      James' untreated opioid use disorder was a serious medical need which was patently obvious to Defendants. His medical records chronicle his OUD suffering, including horrible anxiety, an inability to sleep, and powerful opioid cravings.

9.      In the six weeks before he overdosed and died, James repeatedly told Defendants' medical staff of his fear that without MOUD he would relapse. This medication is proven to dramatically reduce opioid cravings, alleviate withdrawal symptoms, and prevent relapse and overdose, particularly for patients in the criminal justice system.

10.      In 2020, Cumberland County received a $900,000 grant from the U.S. Department of Justice ("DOJ") to improve the medical treatment of people at CCJ who suffered from substance use disorder and prevent relapse and overdose deaths. Upon information and belief, this grant was to be used to provide evidence-based treatment, including MOUD, to those suffering from OUD at the Jail.

11.      In written requests for medical attention, James made his concerns vivid to Defendants. He reported to Defendants that he had "daily cravings," was "constantly having dreams about using again," dreamed of "getting high," and was "still look[ing] for my veins." He pleaded with medical staff that "if my cravings don't go away, my mental state is going to get worse and worse," and "I want help."

12.      Disregarding his acute and obvious OUD medical needs, Defendants failed to provide him essential medical care, telling him in July 2022, the month before he died, that "when we expand the [MOUD] program here [we] will let you know."

13.     On August 11, 2022, Defendant physician assistant Edie Woodward, who worked at CCJ, finally conducted a medical evaluation of James' OUD needs and whether he would benefit from MOUD.  She recognized that James was suffering from "Moderate/Severe Opioid Use Disorder" and previously had success taking Suboxone to control his OUD.

14.     Nevertheless, Defendant Woodward did not provide James with MOUD. She did not enroll him in CCJ's MOUD program. And she did not select any specific start date for medication to begin. Instead, she merely placed him on a list for a chronic care clinic and noted in his medical records that she would "discuss [MOUD] w[ith] the group and try to determine a start date."

15.     Despite knowing that he was suffering from a chronic brain disorder and was struggling with intense daily opioid cravings—and even though CCJ *already operated a treatment program* providing the exact medicine that James needed and had been prescribed—Defendant Woodward did nothing further.

16.     Three days later, while still detained at CCJ, James relapsed, overdosed, and died. His cold body was discovered in his cell with no pulse, a clenched jaw, and blood in the mouth.

17.     He died just hours before he was scheduled to meet his oldest daughter O.M. for the first time since entering CCJ custody. O.M. was coming that morning to celebrate James' upcoming birthday.

<u>**JURISDICTION AND VENUE**</u>

18.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b) because, on information and belief, one or more of the Defendants reside in this judicial District, and a substantial portion of the events giving rise to the claims asserted herein occurred within this District.

## PARTIES

20.     Plaintiff Nicole Bissonnette is the duly appointed Personal Representative of the Estate of James Mannion. The Estate was filed in the Probate Division of Cumberland County.

21.     At all relevant times, James Mannion was in the custody of the CCJ.

22.     Defendant Kevin Joyce is the Sheriff of Cumberland County. He is sued here in his official capacity as Sheriff. At all times relevant to the events at issue in this case, the Cumberland County Sheriff's Department was responsible for the health and safety of people incarcerated and detained at CCJ.

23.     Defendant Armor Correctional Health Care Services, Inc. (also referred to as "Armor Health Predecessor"), is a corporation headquartered in Florida and transacting business in Maine. Pursuant to a 2018 contract with CCJ, Armor Health Predecessor was the sole healthcare provider at the Jail up until 2021. At some times relevant to the events at issue in this case, Armor Health Predecessor was responsible for the implementation, oversight, and supervision of medical policies and practices at CCJ. As an agent of CCJ, Armor Health Predecessor was, at all times relevant to the events at issue in this case, acting under color of law by and through its lawful agents, including but not limited to the individual Defendants.

24.     Defendant Armor Health of Cumberland County (also referred to as "Armor Health"), is a corporation headquartered in Florida and transacting business in Maine. It was incorporated on September 2, 2021, for the purpose of absorbing Armor Health Predecessor's business contracts in Maine and doing business in Maine, including the 2018 contract with CCJ. After taking over Armor Health Predecessor's business contracts in Maine, Armor Health was the sole healthcare provider at the Jail and was responsible for the implementation, oversight, and supervision of medical policies and practices at CCJ.  As an agent of CCJ, Armor Health was, at

all times relevant to the events at issue in this case, acting under color of law by and through its lawful agents, including but not limited to the individual Defendants.

25.    Defendant Edie Woodward was, at all relevant times, an employee of Armor Health Predecessor and/or Armor Health and a physician assistant assigned to CCJ. She is sued here in her individual capacity. At all times relevant to the events at issue in this case, Defendant Woodward was acting under color of law and within the scope of her employment with Armor Health Predecessor and/or Armor Health.

26.    Defendant Jason Simpson was, at all relevant times, an employee of Armor Health Predecessor and/or Armor Health and a registered nurse assigned to CCJ. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Simpson was acting under color of law and within the scope of his employment with Armor Health Predecessor and/or Armor Health.

27.    Defendant Matthew Glazer was, at all relevant times, an employee of Armor Health Predecessor and/or Armor Health and a licensed clinical social worker assigned to CCJ. He is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Glazer was acting under color of law and within the scope of his employment with Armor Health Predecessor and/or Armor Health.

## ALLEGATIONS

**A.    The Defendants failed to treat Mr. Mannion's chronic brain disorder, and he overdosed and died as a result.**

28.    CCJ is the largest jail in Maine. During the period of James' incarceration, it housed both federal and state detainees.

29.    In September 2022, less than three weeks after James' death, the U.S. Marshals Service moved federal detainees out of CCJ because of severe and persistent inadequate staffing.

6

30.     Overdose deaths in Maine reached an all-time high in 2022, driven primarily by the spread of fentanyl, a powerful synthetic opioid. The opioid crisis continues to devastate communities across the state.

31.     In 2020, Armor Health Predecessor and/or Armor Health set up a MOUD program at the Jail. The program purported to provide MOUD, including buprenorphine (Suboxone is a version of buprenorphine), but only to people who entered custody at CCJ with a prescription for MOUD and who did not have illegal drugs in their system.

32.     James first arrived at CCJ on August 29, 2021. Defendant Edie Woodward, a physician assistant employed by Armor Health Predecessor and/or Armor Health conducted a medical evaluation and noted on the medical intake forms that James was "Currently Enrolled" in an MOUD program, was being treated for this chronic brain disorder with Suboxone prescribed by Seaside Mental Health, and that James felt "like shit." James remained in the jail for less than 24 hours, and Defendant Woodward (and the other Defendants) did not provide James with Suboxone or any other MOUD at any point during this period of detention.

33.     James entered CCJ a second and final time on December 3, 2021, and died there of a fentanyl overdose nine months later. Untreated opioid cravings can last for years, and James spent these last months of his life in excruciating suffering.

34.     Defendant James Simpson, a registered nurse employed by Defendant Armor Health Predecessor and/or Armor Health, conducted a medical intake evaluation upon James' arrival in December 2021 and noted in his medical records that James was currently enrolled in a MOUD program, was prescribed Suboxone, and was "currently withdrawing."

35.     Even though he knew James was suffering from OUD, a chronic brain disorder that presents a substantial risk of serious harm (including death), Defendant Simpson did not provide

James the only medication that treats this brain disease, MOUD, nor did he take action to ensure that James was promptly seen or evaluated by a provider to evaluate his need for MOUD.

36.    Despite knowing that James was suffering from this deadly brain disorder, none of the Defendants or their agents enrolled James in CCJ's MOUD program or provided him MOUD at any time during the nine months he was detained there.

37.    Between his arrival at CCJ in December 2021 and his death in August 2022, James filed several sick-call requests seeking treatment for depression and anxiety—both of which are associated with opioid withdrawal and OUD.

38.    According to CCJ's records, James weighed 165 pounds in December 2021.

39.    Over the next nine months, James' weight jumped nearly 100 pounds—another sign of the severe depression commonly associated with withdrawal and OUD. Although James' weight gain was noted in his medical records, Defendants took no steps to address this medical issue, or any of his other acute OUD-related medical needs.

40.    On July 5, 2022, James submitted a written request seeking treatment for his OUD. He wrote that he suffered from daily opioid cravings that exacerbated his anxiety, dreamt of using heroin, had an active Suboxone prescription when he entered custody, and "wanted help."[3]

---

[3] The "MAT" that James noted in this sick-call request refers to medication assisted treatment which includes the use of FDA-approved medications for the treatment of OUD, in combination with counseling and behavioral therapies. These medicines include Suboxone, the medicine that James had been taking to treat his OUD prior to entering CCJ. MOUD refers to these same medications. The phrases "MAT" and "MOUD" are often used interchangeably when referring to these medications.

**ARMOR HEALTH**                    SICK CALL REQUEST

FROM: (PLEASE PRINT)

JAMES MANNION                    5 99235

(Inmate Name)
(Nombre) (Non:)

8/30/91          61/118          (ID #)  4  July 5, 2022
(Date of Birth)   (Localidad)              (Fecha)
(Fecha de Nacimiento)  (Lojman)            (Dat)
(Dat Nesans Prizonye a)  (Housing Unit/Cell#)  (Date / Time)

PROBLEM: (BE SPECIFIC)
PROBLEMA:
PWOBLE'M:  Before getting arrested i was enrolled
in the MAT program. I was on it for
over 18 months. I had an active script when
I came in CCJ in early december. I was
never given a Urine sample. I have cravings
daily, it also makes my anxiety worse. Mentally
it makes me extremly depressed. I Have dreams

about using to the extent i look at my
arms and see veins and it triggers me.
If my cravings dont go away my mental
state is going to get worse and
worse. I want help.

41.     Two days later, Defendant Woodward denied James' request. She told him that
because he did not take a urine drug test upon entering custody (and therefore could not prove he
did not have illegal drugs in his system), he was ineligible for CCJ's MOUD program.

42.     James had entered CCJ more than seven months earlier, but his untreated opioid
cravings were still powerful. Indifferent to his serious medical needs, which included intense
opioid cravings, depression, and anxiety, Woodward told him that "when we expand the program
here I will let you know."

43.     Twelve days later, on July 17, 2022, James filed another sick-call request, writing
that "I'm constantly having dreams about using again. I will wake up having dreams about getting
high, even looking at my arms. I still look for my veins." Defendant Woodward did not conduct a
medical examination to determine if he would benefit from MOUD. Unconcerned about his acute
medical needs, she provided no medication to address his intense opioid cravings or medically

treat his underlying brain disorder, and instead simply marked his request for urgent medical care as "routine."

44.    The next day, on July 18, 2022, James submitted a follow-up sick call request, writing that after talking to staff in CCJ's mental health group, he was told to file another request for MOUD "because I have been on it in the past." Once again, none of the Defendants provided him with his previously prescribed medicine, did not enroll him in their MOUD program, and did not select a treatment start date. Instead, Defendant Woodward simply replied in writing that there was an unspecified future appointment where they would discuss the issue.

45.    That same day, Defendant Matthew Glazer, a licensed clinical social worker employed by Armor Health Predecessor and/or Armor Health, noted in James' medical records that James reported "increased drug cravings and dreams," "that [it] is all he can focus on," and that he was "questioning if [MOUD] is an option for him." Nevertheless, Defendant Glazer (and the other Defendants) took no action to ensure that James was medically evaluated for OUD or that his obvious and acute OUD symptoms and needs were medically addressed.

46.    Ten days later, on July 28, 2022, Defendant Woodward noted in James' medical records that he had requested MOUD and had a history of treating his opioid use disorder with Suboxone. But Defendant Woodward still did not conduct a medical evaluation to determine if James would benefit from MOUD or ensure that James was appropriately seen and treated in prompt fashion. Instead, Defendant Woodward simply noted vaguely (and without any reference to timeframe) that medical staff would follow up after discussing his requested medical treatment with the MOUD team.

47.    For multiple weeks, Defendants took no further action to address James' worsening OUD medical needs.

48.    On August 11, 2022, Defendant Woodward finally had a follow-up meeting with James regarding his worsening OUD condition. She recognized that James required MOUD, noting in his medical records that James was suffering from "Moderate/Severe Opioid Use Disorder" and had previously had success taking Suboxone to control his OUD.

49.    Nevertheless, Defendant Woodward did not provide James with MOUD. She did not enroll him in the MOUD program at the Jail. And she did not select any particular start date for medication to begin. Instead, she merely placed him on a list for an unspecified chronic care clinic and noted that she would, at some unspecified future date, "discuss [MOUD] w[ith] the group and try to determine a start date."

50.    Three days later, James overdosed and died from fentanyl supplied by another detainee at CCJ. This, unfortunately, is far too common. One study showed that the risk of unnatural death, including overdose, suicide, and other preventable causes was about 87% lower for incarcerated people on MOUD compared to those whose OUD needs were ignored.[4]

51.    At the time of his death, Defendants still had not provided or offered James any version of MOUD to treat his chronic brain disorder, had not enrolled him in the MOUD program at the Jail, and had not selected a treatment start date.

52.    James died alone in his cell. Medical staff were called to James' cell at 5:45 a.m. on August 14, 2022. His body was found, according to Defendants' medical records, "pale and cool to touch," with no pulse. His jaw was clenched and there was blood in his mouth. His death certificate identified his cause of death as overdose from the "toxic effect" of fentanyl, an antihistamine, and depression medicine.

---

[4] Sarah Larney et al., *Opioid substitution therapy as a strategy to reduce deaths in prison: retrospective cohort study*, BMJ Open 4, no. 4 (April 2014):1-8, https://bmjopen.bmj.com/content/4/4/e004666 (lasted visited July 11, 2024).

53.    Upon information and belief, no CCJ or Armor Health Predecessor and/or Armor Health staff checked on James for hours after he overdosed and none carried naloxone, which, if timely administered, could have saved his life.

54.    Naloxone is a proven and effective opioid overdose reversal medicine that is administered by a nasal spray. According to Defendant Sheriff Joyce, CCJ changed their naloxone policy and practice after James' overdose death to protect people in custody and correctional staff.

**B.    Opioid Use Disorder is a life-threatening brain disease that alters the brain's dopamine system.**

55.    Opioids are a class of drugs that inhibit pain and cause feelings of pleasure. Some opioids, such as oxycodone, have accepted medical uses, including managing severe or chronic pain. Others, such as heroin, are illegal and not used as medicine in the United States. But all opioids are highly addictive.

56.    OUD is a chronic, relapsing brain disease that can have deadly consequences.

57.    OUD is a progressive brain disorder, meaning it often becomes more severe over time.

58.    People who regularly use opioids develop a tolerance to them and need to use increasing amounts to feel the desired effect.

59.    At high doses, opioids depress the respiratory system, sometimes causing the user to stop breathing, which can result in death.

60.    Without effective treatment, people with OUD are often unable to stop their opioid intake, leading to serious physical and emotional harm.

61.    OUD breaks down the user's dopamine system. Dopamine is a neurotransmitter that plays a key role in feeling pleasure, movement, memory, and other body functions. Dopamine is necessary for the brain to feel a sense of normalcy and to perform cognitive functions necessary

for survival. People who have dopamine level changes due to OUD have difficulty enjoying life activities and feeling normal, and often experience depression, anxiety, and irritability.

62.     Continued use of opioids does not indicate a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that cause uncontrollable opioid cravings. People with this brain disorder thus cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences.

63.     OUD has thus proven especially resistant to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which have been popular in treating other addictions, such as alcoholism.

**C.      MOUD allows millions of Americans who suffer from OUD to live healthy and productive lives.**

64.     MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention.

65.     MOUD also lowers the likelihood of criminal activity, reduces infectious disease transmissions, and improves patients' ability to maintain positive family relationships and employment.

66.     While treatment typically consists of medication combined with counseling and other behavioral therapies, medication is the primary driver of efficacy.

67.     The Food and Drug Administration has approved three medications for treating OUD: methadone, buprenorphine, and naltrexone. These medications (and the different variations of each) are not the same and cannot be used interchangeably for every patient.

68.     Methadone and buprenorphine are "agonists," which mean they activate opioid receptors in the brain to relieve withdrawal symptoms and control opioid cravings. The medicine

that James took for his OUD prior to incarceration at CCJ, Suboxone, is a version of buprenorphine.

69.     Methadone is a "full agonist," meaning that it fully activates opioid receptors, (resulting in a stronger therapeutic effect), while buprenorphine is a "partial agonist," meaning that it partially activates opioid receptors (resulting in a different but still effective therapeutic effect).

70.     Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being activated by other opiates or opioids. This means that patients cannot get "high" from illicit drugs like heroin and fentanyl while on these medications. This, in turn, trains opioid receptors in the brain that are negatively impacted by OUD to gradually decrease their response and interest in opioids.

71.     There is no maximum recommended duration for MOUD treatment. As the Substance Abuse and Mental Health Services Administration ("SAMHSA") has recognized, treatment for OUD—like treatment for other chronic diseases such as insulin for diabetes—is often lengthy and can last for years or even a lifetime.[5]

72.     MOUD does not substitute one drug for another. As SAMSHA makes clear, MOUD are "evidence-based treatment options" that "relieve the withdrawal symptoms and psychological cravings that cause chemical imbalances in the body."[6]

**D.     MOUD is essential to address OUD and the opioid epidemic.**

73.     The AMA, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the Food and Drug Administration, the National Institute on Drug Abuse, the White House Office of National Drug Control Policy, SAMHSA, and the World Health

---

[5] SAMHSA, *TIP 63: Medications for Opioid Use Disorder,* https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf (last visited July 11, 2024).
[6] SAMHSA, *Medications, Counseling, and Related Conditions*, https://www.samhsa.gov/medications-substance-use-disorders/medications-counseling-related-conditions (last visited July 11, 2024).

Organization all endorse the critical role of MOUD—specifically methadone and buprenorphine—in addressing OUD.

74.    The AMA is the nation's preeminent association of physicians and medical students. According to the AMA, MOUD is the well-accepted "standard of care for patients in jail and prison settings."[7] The AMA unequivocally supports the removal of "administrative burdens or barriers that delay or deny care for FDA-approved medications used as part of medication assisted treatment (MAT) for opioid use disorder (OUD)."[8]

75.    Ensuring MOUD access in the criminal legal system is also a top priority of the U.S. Department of Justice ("DOJ"). The third element of DOJ's 2022-2026 Strategic Plan to address the nation's drug and overdose crisis is making sure that incarcerated people receive the MOUD they need and are entitled to under the nation's civil rights laws and constitutional protections.[9]

76.    This focus is not new. DOJ has repeatedly determined that MOUD access is legally and constitutionally required in carceral settings and court programs. Moreover, DOJ has confirmed that denying incarcerated and detained people access to MOUD violates their civil rights and constitutional protections.

77.    In January 2021, DOJ's Civil Rights Division, for example, issued a report concluding that the Cumberland County Jail in Bridgeton, New Jersey, violated the Eighth and

---

[7] American Medical Association, *AMA Calls for Access to Substance Use Disorder Treatment in Prisons, Jails* (2021), https://www.ama-assn.org/press-center/press-releases/ama-calls-access-substance-use-disorder-treatment-prisons-jails (last visited July 11, 2024).

[8] Am. Med. Ass'n Opioid Task Force, *AMA Opioid Task Force Issues New Recommendations*, https://end-overdose-epidemic.org/wp-content/uploads/2020/06/2019-AMA-Opioid-Task-Force-Recommendations-FINAL.pdf    (last visited July 11, 2024).

[9] U.S. Dep't of Just., *FYs 2022-2026 Strategic Plan* 33, https://www.justice.gov/doj/book/file/1516901/download (last visited July 11, 2024).

Fourteenth Amendments by failing to provide MOUD to the approximately 25% of its custodial population suffering from OUD.[10]

78.     According to the DOJ report, "because [MOUD] is the standard of care, categorically denying [MOUD] to inmates with Opioid Use Disorder is a failure to provide adequate medical care for this serious medical condition."[11]

79.     Many other law enforcement and correctional groups have also recognized the necessity of providing MOUD to those who need treatment for this chronic brain disorder, including the Bureau of Prisons ("BOP"), the American Correctional Association, the National Sheriffs' Association, and the National Commission on Correctional Health Care ("NCCHC").[12]

80.     According to the BOP, which oversees 122 federal correctional facilities and more than 150,000 federal prisoners, MOUD, combined with behavioral therapy, "is the generally accepted standard of care" for OUD.[13]

81.     The BOP has concluded that "studies show that medications for opioid use disorder reduce drug use, disease rates, and overdose events and increases retention in treatment programs while promoting recovery among individuals with OUD."[14] As a result, BOP directs medical staff

---

[10] U.S. Dep't of Just., *Investigation of The Cumberland County [New Jersey] Jail* (Jan. 14, 2021), https://www.justice.gov/opa/press-release/file/1354646/download (last visited July 11, 2024) ("CCJ has engaged in a pattern or practice of violating rights protected by the Eighth and Fourteenth Amendments because it fails to provide prisoners with constitutionally adequate medical and mental health care").

[11] *Id.* at 6.

[12] In 2021, the NCCHC published guidelines calling for "universal OUD screening" and the provision of MOUD to those who need this treatment in jail, prisons, and detention facilities. According to the NCCHC, this will "reduce deaths, improve long-term health outcomes, [and] interrupt the cycle of recidivism." *Opioid Use Disorder Treatment in Correctional Settings (2021)*, Nat'l Comm'n on Corr. Health Care (2021), https://www.ncchc.org/opioid-use-disorder-treatment-in-correctional-settings-2021/ (last visited July 11, 2024).

[13] *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment*, Fed. Bur. of Prisons Clinical Guidance 6 (2021), https://www.bop.gov/resources/pdfs/opioid_use_disorder_cg.pdf (last visited July 11, 2024).

[14] *Id.*

at all its correctional facilities to screen people for OUD "throughout their incarceration" and provide MOUD to those who need it.

82.    Jails and prisons are a particular focus in the federal government's response to the opioid crisis because so many people in the criminal justice system struggle with substance use disorder, particularly OUD.[15]

**E.    Forced withdrawal from opioids unassisted by MOUD is dangerous and often deadly.**

83.    Forced and abrupt withdrawal (also known as forced detoxification) from opioids and MOUD often triggers painful withdrawal symptoms that markedly increase the risk of relapse, overdose, and death.

84.    Forced detoxification is so traumatic on the body that it can cause pregnant women to miscarry and lead to other life-threatening complications.

85.    Patients forced into detoxification should expect the return of intense opioid cravings that MOUD neutralize.

86.    The physical and mental symptoms of forced detoxification are often crushing. They include bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, and insomnia. James suffered painful withdrawal symptoms after entering custody, including tortuous anxiety and insomnia.

---

[15] U.S. Dep't of Just., *Investigation of The Cumberland County [New Jersey] Jail* (Jan. 14, 2021), https://www.justice.gov/opa/press-release/file/1354646/download ("Approximately 80 percent of jail and prison inmates have a history of substance abuse, and over two-thirds of jail detainees have a substance abuse disorder. . . .In New Jersey, at least 25 percent of the incarcerated population is addicted to opioids.") (last visited July 11, 2024).

87.    These symptoms can last for weeks or months and lead to life-threatening complications—even apart from the risk of relapse and overdose—including pneumonia and fatal dehydration.

88.    Numerous medical and law enforcement organizations warn against forced detoxification without the provision of MOUD and the abrupt cessation of MOUD because doing so elevates the risk of relapse, overdose, and death, and is a barrier to treatment and recovery.

89.    The Centers for Disease Control and Prevention, for example, cautions that "opioid therapy should not be discontinued abruptly" and that "[d]etoxification on its own, without medications for opioid use disorder, is not recommended for opioid use disorder because of increased risks for resuming drug use, overdose, and overdose death."[16]

90.    When someone with an addiction or dependence on opioids (illicit or prescription) plans to cease use, MOUD should be used to ease the transition and avoid withdrawal symptoms.

**F.    Providing MOUD in jails and prisons saves lives.**

91.    MOUD treatment is the well-accepted standard of care for people with opioid addiction. MOUD treatment in jail and prisons is also good public health policy. Numerous studies have shown that MOUD access in correctional facilities reduces opioid use, overdose deaths, and criminal recidivism rates, and increases the likelihood of continued addiction treatment.[17]

92.    For example, one study involving Rhode Island's unified jail and prison system, which provides all OUD patients with full access to MOUD, found that: (1) 95% of the individuals

---

[16] Centers for Disease Control and Prevention, Opioid Use Disorder: Treatment and Prevention, https://www.cdc.gov/overdose-prevention/hcp/clinical-care/opioid-use-disorder-treating.html (last visited July 11 , 2024).

[17] Nat'l Inst. on Drug Abuse, *Effective Treatments for Opioid Addiction*, Policy Brief (2016), *available at* https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction (last visited July 11, 2024).

in the MOUD program continued drug treatment after release; (2) post-release deaths for participants declined by 60%; and (3) all opioid-related deaths in the state fell by over 12% in just the first year of operation.[18]

93.    Another large study of a different MOUD program within a correctional setting documented an 85% decrease in overdose deaths and a 75% reduction in overall mortality in the first four weeks after release for people who were maintained on MOUD while incarcerated.[19]

94.    Defendants knew that James suffered from OUD. They knew that he was suffering from intense opioid cravings. And they knew the medical necessity of providing him MOUD to treat this chronic brain disorder.

95.    Even though the Jail *already operated a treatment program* providing the exact medicine that James needed and was previously prescribed, none of the Defendants provided him MOUD. None enrolled him in the jail's MOUD program. And none selected a medication start date.

96.    If James had been provided the MOUD that he desperately needed, his opioid cravings would have been neutralized and he would still be alive today. By denying James access to MOUD, they caused his death.

## COUNT I
### 42 U.S.C. § 1983 - Fourteenth Amendment
### All Individual Defendants

97.    Each of the Paragraphs of this Complaint is incorporated herein.

---

[18] Lauren Brinkley-Rubinstein et al., *The Benefits and Implementation Challenges of the First State-Wide Comprehensive Medication for Addictions Program in a Unified Jail and Prison Setting*, 205 Drug and Alcohol Dependence (Dec. 2019).

[19] John Marsden et al., *Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death After Release? A National Prospective Observational Study in England*, Addiction 112, no. 8 (2017): 1408–18, https://pubmed.ncbi.nlm.nih.gov/28160345/ (last visited July 11, 2024).

98.    At all relevant times, Plaintiff suffered from an objectively serious medical condition.

99.    In the manner described more fully above, Defendants were aware of James Mannion's serious OUD medical needs and knew the risk of harm if he did not receive appropriate medical care. Despite this knowledge, Defendants failed to provide him with proper medical care or access to medical care, in violation of the Fourteenth Amendment to the United States Constitution.

100.    As a result of Defendants' unjustified and unconstitutional conduct, Mr. Mannion experienced injuries, including but not limited to pain, suffering, emotional distress, and preventable death.

101.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Mannion's rights.

102.    Defendants were deliberately indifferent to Mr. Mannion's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to his rights.

103.    Mr. Mannion's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by Defendants' policies and practices.

<u>**COUNT II**</u>
**42 U.S.C. § 1983 - *Monell* Claim (Fourteenth Amendment)**
**Defendants Armor Health Predecessor, Armor Health, and Joyce**

104.    Each of the Paragraphs of this Complaint is incorporated herein.

105.    The violations of Mr. Mannion's rights under the Fourteenth Amendment to the United States Constitution, and the injuries and eventual death that he suffered as a result were

proximately caused by the policies and practices of Armor Health Predecessor and/or Armor Health and Joyce.

106.    At all times relevant to the events at issue in this case, Defendant Armor Health Predecessor and/or Armor Health contracted with the CCJ to provide medical and mental healthcare to people, including Mr. Mannion, housed at the Jail. As the CCJ's sole provider of healthcare services, Armor Health Predecessor and/or Armor Health was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to people in CCJ's custody.

107.    By contracting with Defendant Armor Health Predecessor and/or Armor Health to provide all medical and mental health care at CCJ, Defendant Joyce delegated final policymaking authority to Armor Health Predecessor and/or Armor Health on the topics of medical and mental health care to detainees in Joyce's custody.

108.    At CCJ, there existed policies or widespread practices pursuant to which incarcerated and detained people there received unconstitutionally inadequate healthcare, including policies and practices pursuant to which Armor Health Predecessor and/or Armor Health healthcare personnel: (1) denied patients MOUD despite their medical need for it; (2) delayed the provision of MOUD despite the medical need for it; (3) failed to equip staff with necessary and life-saving medicine—including naloxone—despite knowing that there was a serious risk of relapse and overdose; (4) failed to respond or follow up on complaints by patients about their health status; (5) failed to create sensible treatment plans for patients whose health status requires the creation of such a plan; (6) failed to schedule appropriate follow-up medical appointments; (7) failed to provide necessary medication; (8) failed to provide adequate healthcare staffing; and (9)

21

failed to promptly evaluate patients with serious medical needs or arrange for patients to be referred for specialty evaluation or treatment, even when such a referral was necessary or proper.

109.    Prior to the events giving rise to Plaintiff's Complaint, Defendant Armor Health Predecessor and/or Armor Health was on notice of these policies or widespread practices. Yet Defendant Armor Health Predecessor and/or Armor Health did nothing to modify or correct these policies or widespread practices to ensure that patients, like Mr. Mannion, received adequate access to care for OUD.

110.    To the contrary, these widespread policies and practices were allowed to flourish because Defendant Armor Health Predecessor and/or Armor Health, which oversees the provision of healthcare services within the CCJ, directly encouraged the very type of misconduct at issue in this case. In this way, Defendant Armor Health Predecessor and/or Armor Health violated Mr. Mannion's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

111.    The above-described practices, so well-settled as to constitute de facto policy within CCJ, were able to exist and thrive because Defendant Armor Health Predecessor and/or Armor Health was deliberately indifferent to the problem, thereby effectively ratifying it.

Mr. Mannion's injuries were caused by Armor Health Predecessor and/or Armor Health, including but not limited to the individually named Defendants who acted pursuant to the foregoing policies and practices and in engaging in the misconduct described above.

### COUNT III
**42 U.S.C. § 1983 – Failure to Protect (Fourteenth Amendment)**
**All Individual Defendants**

112.    Each of the Paragraphs of this Complaint is incorporated herein.

113.    In the manner more fully described above, Defendants had reasonable opportunity to prevent the violation of Mr. Mannion's constitutional rights as set forth above had they been so inclined, but they failed to do so.

114.    Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Mannion's rights.

115.    As a direct and proximate result of the failures referenced above, Mr. Mannion's rights were violated and he suffered injuries, including but not limited to physical pain and suffering, emotional distress, and death.

116.    Mr. Mannion's death was caused by employees of CCJ and Armor Health Predecessor and/or Armor Health, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

**COUNT IV**
**State Law - Wrongful Death**
**All Defendants**

117.    Each of the Paragraphs of this Complaint is incorporated herein.

118.    In the manner more fully described above, the actions of Defendants breached the duty of care owed to detainees in their custody and care. They did so by deliberately and (in the case of Armor Health Predecessor and/or Armor Health and its employees) negligently ignoring Mr. Mannion's repeated requests for medical attention.

119.    Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

120.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Mannion suffered injuries, including death.

121.    Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

122.    Defendants' actions proximately caused Mr. Mannion serious bodily harm and death, as well as great physical and emotional pain and suffering.

123.    Plaintiff Nicole Bissonnette, and all other legally recognized family members, claim damages for the wrongful death of Mr. Mannion, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, and for the mental anguish caused by this loss, as well as for funeral expenses pursuant to Me. Rev. Stat. tit. 18-C § 2-807, commonly known as the Maine Wrongful Death Act.

### COUNT V
### State Law - Survival Action
### All Defendants

124.    Each of the Paragraphs of this Complaint is incorporated herein.

125.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to detainees in their care. They did so by ignoring Mr. Mannion's requests for medical attention.

126.    Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

127.    The misconduct described in this Count was undertaken with intentional disregard of Mr. Mannion's rights.

128.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Mannion suffered great conscious pain and suffering prior to his death.

129.     Mr. Mannion filed no action during his lifetime, but under the law of the State of Maine, this action survives and may be asserted by his Estate.

130.     Plaintiff Nicole Bissonette, on behalf of the Estate of James Mannion, claims damages for the conscious pain and suffering of Mr. Mannion, pursuant to Me. Rev. Stat. tit. 18-C § 2-817, commonly referred to as the Maine Survival Act.

**COUNT VI**
**Respondeat Superior**
**Defendants Armor Health Predecessor and Armor Health**

131.     Each of the Paragraphs of this Complaint is incorporated herein.

132.     In committing the acts alleged in the preceding paragraphs, the above-described Defendants were employees, members, and agents of Armor Health Predecessor and/or Armor Health, acting at all relevant times within the scope of their employment.

133.     Consequently, Defendant Armor Health Predecessor and/or Armor Health is liable for the actions of its employees acting within the scope of their employment under state law.

134.     Defendant Armor Health Predecessor and/or Armor Health, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment.

**COUNT VII**
**42 U.S.C. § 12132 – Americans with Disabilities Act**
**Defendant Joyce**

135.     Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

136.     Congress enacted the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

25

benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

137.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

138.    CCJ is a public entity as defined in 42 U.S.C. § 12131(1). Defendant James is sued in his official capacity.

139.    James Mannion has a disability—opioid use disorder—within the meaning of the Americans with Disabilities Act. He was otherwise qualified to participate in programs, services, or benefits offered by CCJ, including but not limited to access to medical and mental health services.

140.    Despite Mr. Mannion's known disability, CCJ failed to reasonably accommodate his disability and discriminated against him, as described above. As a result of the Defendants' conduct, Mr. Mannion suffered injuries, including pain, suffering, and death.

141.    Defendants provided necessary medications to treat countless other types of diseases yet discriminated against Mr. Mannion (and other patients with opioid use disorder) by failing to provide him the medication for his chronic brain disorder that he needed.

142.    Defendants' choice to withhold critical MOUD treatment from Mr. Mannion and others in his situation was the direct result of discriminatory animus against those who suffer from OUD.

143.    Accordingly, the Defendants' conduct as alleged in the Complaint violated Title II of the Americans with Disabilities Act.

**COUNT VIII**
**29 U.S.C. § 794 – Rehabilitation Act**
**Defendant CCJ**

144.    Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

145.    Mr. Mannion had a disability—opioid use disorder—within the meaning of the Rehabilitation Act. When detained at CCJ, he was qualified to participate in programs, services, or benefits offered at the Jail, including but not limited to access to medical and mental health services.

146.    Under the Rehabilitation Act, the Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded form participation in or denied the benefits of its services, programs, or activities because of their disability.

147.    The CCJ received federal funding.

148.    Despite Mr. Mannion's known disability, the Defendants failed to reasonably accommodate his disability against him as described above. As a result of the Defendants conduct, Mr. Mannion suffered injuries, including pain, suffering, and death.

149.    Accordingly, Defendants' conduct as alleged in the Complaint violated the Rehabilitation Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Estate of James Mannion, through its Personal Representative, hereby respectfully requests that this Court enter a judgment in its favor and against Defendants

Cumberland County Sheriff Kevin Joyce, Armor Correctional Health Care Services, Inc., Armor Health of Cumberland County, Edie Woodward, Jason Simpson, and Matthew Glazer, awarding declaratory relief, compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff Nicole Bissonnette hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: August 30, 2024

            Respectfully submitted,

            <ins>/s/ Sarah Grady</ins>
            Sarah Grady
            David Howard Sinkman
            Amelia Caramadre
            KAPLAN & GRADY LLC
            2071 N. Southport Ave., Ste. 205
            Chicago, Illinois 60614
            (312) 852-2184
            sarah@kaplangrady.com

            Alexis Chardon
            GARMEY LAW
            482 Congress Street, Suite 402
            Portland, ME  04101-3424
            (207) 899-4644
            achardon@garmeylaw.com

            *Attorneys for Plaintiff*